UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARIANNE V. PEIRANO,

    Plaintiff,

v.

MOMENTIVE SPECIALTY
CHEMICALS, INC.,

    Defendant.

Case No. 2:11-CV-00281
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

Plaintiff, Marianne V. Peirano ("Peirano"), brings the instant action against Defendant,

Momentive Specialty Chemicals, Inc. ("Momentive"), alleging claims for disability

discrimination, failure to accommodate, and retaliation pursuant to the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and Ohio's anti-discrimination statute, Ohio

Revised Code, § 4112.01 *et seq.* This matter is before the Court for consideration of

Momentive's Motion for Summary Judgment as well as Momentive's Motions to Strike. (ECF

Nos. 22, 30, 35.) For the reasons that follow, the Motion for Summary Judgment is **GRANTED**

in part, but **DENIED** with regard to Peirano's claims for disability discrimination, failure to

accommodate, and retaliation.[1] Momentive's Motions to Strike are **DENIED** subject to the

conditions outlined in this Opinion and Order.

---

[1] In addition to disability discrimination and retaliation claims, Peirano brings various
wage and hour claims within her Complaint pursuant to both state and federal law. Peirano,
however, does not contest Momentive's Motion for Summary Judgment as it applies to these
claims and in fact consents to dismissal. Accordingly, Momentive's Motion for Summary
Judgment is **GRANTED** with regard to Peirano's claims alleging failure to pay minimum wage
and overtime.

## I. Background

Momentive is an Ohio based corporation that specializes in thermoset resins. On January 29, 2009, Momentive hired Peirano to work as a customer service representative ("CSR") in Gahanna, Ohio. While working for Momentive, Plaintiff was diagnosed with ischemic colitis. (Peirano Dep. 61, ECF No. 22-2.) Peirano also suffers from irritable bowel syndrome ("IBS") and a blood clotting disorder. (*Id.* at 10, 19–20.) Momentive ultimately terminated Peirano on January 14, 2011. (*Id.* at 247–48.) Momentive contends that it discharged Peirano primarily because of poor attendance. (*See* Mem. Summ. J. 27, ECF No. 22-1.)

### A.     The CSR Position and Momentive's Attendance Policy

The Gahanna office of Momentive applies "a relationship-driven service model" to customer service. (Simmons Decl. ¶ 4, ECF No. 22-8.) Accordingly, Momentive assigns each CSR specific customers. (*Id.*) Each CSR has a designated backup who is responsible for that CSR's customers when he or she is absent from work. (*Id.*) The CSRs have staggered, but fixed, work schedules with three different shifts: 7:00 a.m. to 4:00 p.m.; 8:00 a.m. to 5:00 p.m.; and 9:00 a.m. to 6:00 p.m. (*Id.* at ¶ 6.) When a customer calls a CSR who is unavailable, the customer has the option of being forwarded to that CSR's voicemail or speaking to the next available representative. (Harrison Aff. ¶ 12, ECF No. 26-1.)

Peirano was a member of the Epoxy CSR team, which included six other CSRs. (Peirano Dep. 96–97.) Christine Marinello ("Marinello") was the supervisor of the Epoxy team during the time of Peirano's employment. (Simmons Decl. ¶ 7.) Peirano worked the 9:00 a.m. to 6:00 p.m. shift once she completed training. (Peirano Dep. 37.) Her backup CSR was Junie Harrison ("Harrison"). (Peirano Dep. 97.) Gaye Salazar ("Salazar") was the human resources contact for

2

the Epoxy team. (*See* Salazar Decl. ¶ 1.)

Momentive's Attendance and Reliability Policy requires regular attendance from employees. (*See* Salazar Ex. 2, ECF No. 23-1.) The Policy provides that when employees "cannot avoid being late to work or are unable to work or are unable to work as scheduled, they should notify their supervisor as soon as possible in advance of the anticipated tardiness or absence or in accordance with local call in procedures." (*Id.* at 1) The Policy further provides "[a]n associate's attendance is considered to <u>not meet expectations</u> if the associate attains more than 3 countable occurrences of lost time in a rolling twelve-month period and 'needs improvements'." (*Id.* at 3.) "An 'occurrence' is defined as one event of lost time such as a missed shift or day . . . or being late for work."[2] (*Id* at 2.) The Policy warns that violations of the attendance requirements may result in corrective action, including dismissal. (*Id.* at 3.) Supervisors are responsible for monitoring attendance and must consider attendance trends in implementing the policy. (*See id.* at 1–2.)

Peirano does not dispute the terms of Momentive's attendance policy. Peirano submits evidence, however, to suggest that Marinello did not strictly enforce Momentive's attendance policy against other, non-disabled, employees. Peirano contends that Carmen Casafront ("Casafront"), a CSR working under Marinello who did not suffer from a medical condition, arrived to work late on several occasions, and took longer than one hour lunch breaks, but was not disciplined due to her attendance.[3] (Casafont Aff. ¶ 20, ECF No. 26-4.) Additionally,

---

[2] Certain circumstances, such as medical leave, "are not countable" as occurrences. (Salazar Ex. 2 at 2.)

[3] Momentive submits evidence indicating that Marinello did track Casafront's attendance and punctuality. (Salazar Ex. 7, ECF No. 23-1.) This evidence does not reflect, however, that

Harrison avers that she witnessed Michael Leskovac, another CSR under Marinello's supervision, arrive late on a regular basis. (*See*, Harrison Aff. ¶ 21.) Momentive, on other hand, provides evidence indicating that Marinello monitored and took corrective action against other CSRs, such as Willie Woodruff and Devon Lyles, due to attendance problems. (*See, e.g.*, Salazar Ex. 8, ECF No. 23-1; Reply Ex. 3, ECF No. 31-1.)

## B.    Peirano's Condition and Request for Accommodation

As mentioned above, Momentive hired Peirano in late January 2010. Beginning in March 2010, Peirano began experiencing health problems. (*See* Peirano Dep. 37–38.) Plaintiff was eventually hospitalized for an extended period in early April 2010. (*Id.* at 42.) At this time, she was diagnosed with ischemic colitis. (*Id.* at 61.) Peirano's physician cleared her to work on April 8, 2010, but noted that she may have to use the rest room frequently. (Salazar Ex. 4, ECF No. 23-1.) Plaintiff attempted to return to work on April 12, 2010, but went to the emergency room before completing a full day. (Peirano Dep. 62.) She returned to work again on April 21, 2010. (*Id.* at 74.) Short-term disability covered Peirano's work absences during this period. (*See id.* at 64–73, 104.)

Upon returning to work on April 21, 2010, Peirano met with Marinello to discuss possible accommodations for her condition. (Peirano Dep. 75.) Peirano specifically requested extended, and more frequent, bathroom breaks as well as a flexible start time. (*Id.* at 75–76.) She explained to Marinello that she was unable to control her bowels due to her condition. (*Id.* at 75.) Marinello permitted Peirano to have extended and more frequent bathroom breaks and

Casafront was ever officially disciplined for her attendance. (*Id.*) Marinello's notes do state, however, that on one occasion she told Carmen that she needed to call in advance if she was going to be late. (*Id.*)

indicated that Peirano could call in as soon as possible if she was going to be late, but Marinello did not agree to a flexible start time. (*Id.* at 75–77.)

On May 6, 2010, Plaintiff was again hospitalized for an extended period due to abdominal pain. (Peirano Dep. 93.) Once again, short-term disability covered Peirano's absences. (*Id.* at 104.) Peirano returned to work on June 3, 2010.[4] (*Id.* at 102.) According to Plaintiff, Momentive's doctor restricted her to no heavy lifting with frequent bathroom breaks, and indicated that she would have "unpredictable onsets of symptoms" that would leave her "debilitated at times." (*Id.* at 103.) Peirano's testimony confirms that her symptoms were often instantaneous, requiring her to rush to the bathroom. (*Id.* at 107.) Plaintiff maintains that upon her return Marinello told her that she must call in before 9:00 a.m. if she was going to be late. (*Id.* at 105.) Moreover, Plaintiff contends that in September 2010, Marinello again changed the call in standard, requiring Plaintiff to call in ten to fifteen minutes before 9:00 if she was going to be late. (*Id.* at 196.)

## C. Peirano's Attendance and Employment History

### 1. Attendance Records

Momentive submits records from Marinello, as well as corrective action forms,[5] to establish that Peirano had an extensive history of poor attendance and tardiness. (*See* Peirano Dep. Exs. I, N, O; Salazar Ex. 3, ECF No. 23-1.) Specifically, Marinello took regular notes

---

[4] Peirano reports that her doctor actually cleared her to return to work a week prior to June 3, 2010. (Peirano Dep. 103.) Momentive postponed her return, however, until it received medical testing results. (*Id.*)

[5] The records suggest that the attendance information within the corrective action forms is based on Marinello's records concerning Peirano's attendance and punctuality. (*Compare* Peirano Dep. Exs. I, N, O; *with* Salazar Ex. 3.)

regarding Peirano's attendance. (*See* Salazar Ex. 3.) These records indicate that even before Peirano's hospitalization in April she had been late to work on numerous occasions. (*Id.*) Following Peirano's return to work in June 2010, Marinello's records reflect that she was frequently late, either at the beginning of the day or when returning from lunch, often without calling or calling after the beginning of her shift. (*Id.*) Marinello's notes further reflect that some of Peirano's late arrivals were not related to her medical condition. (*Id.*) Ultimately, based on these records, Momentive contends that during her eleven months working Peirano was late or absent 102 times and accumulated forty-one countable occurrences under Momentive's attendance policy. (*See* Mem. Summ. J. 1, 22, 26; Salazar Ex. 3; Peirano Dep. Exs. I, N, O.)

Momentive further maintains that, in addition to attendance problems, Peirano openly criticized her co-workers on a few occasions. (*See* Salazar Decl. ¶¶ 7–8; Salazar Ex. 5, ECF No. 23-1.) Salazar states that in September 2010 Peirano complained loudly that there was going to be a "major catastrophe" because of a mistake her back-up, Harrison, had made. (Salazar Decl. ¶ 7.) On another occasion, Peirano reportedly stated that a co-worker "does not know anything" in front of her team members. (*Id.* at ¶ 8.)

Peirano disputes the accuracy of Marinello's attendance records. Although Peirano concedes she was sometimes late due to her medical conditions, she maintains that on such occasions she would call in as soon as possible. (*See, e.g.*, Peirano Dep. 130, 133.) Peirano contends, however, that Marinello would write her up as late on days when she called in. (*See, e.g.*, *id.* at 130, 139–40.) Additionally, Peirano asserts that she was not late on some of the days when Marinello marked her late. (*See, e.g.*, *id.* at 138, 156, 158, 161.) Peirano submits that, to cover herself, she eventually began calling co-workers to prove that she was calling in when she

6

was going to be late. (*Id.* at 130; Harrison Aff. ¶ 15; Longacre-Dunn Aff. ¶ 16; Casafont Aff. ¶ 16.) Peirano's co-workers also explain that the clocks within the Gahanna office differed "by up to fifteen minutes" in time. (Harrison Aff. ¶ 25; Casafont Aff. ¶ 27.)

Peirano concedes that she was late a few times for non-medical reasons. (*See* Peirano Dep. 109.) She specifically admits that one occasion her dog's 8:30 grooming appointment was delayed, making her about ten minutes late to work. (*Id.* at 110.) Peirano states, however, that she called in at approximately 8:45 to let Marinello know. (*Id.*) Peirano reported another incident where she arrived early on the day of a potluck, but forgot her dish. (*Id.* at 113–14.) Peirano states that Marinello allowed her to go back home to get her dish even though this would result in her being late. (*Id.* at 114.) Finally, Peirano also testifies, through her deposition testimony, that she was likely late on a day in July when she had to be in the hospital with her stepdaughter the whole night before. (*See id.* at 162–66.) Peirano states, and Marinello's notes confirm, that Peirano called Marinello early in the morning to inform her of the situation. (*Id.* at 162–63; Salazar Ex. 3.)

In addition to challenging Marinello's general records, Peirano submits evidence regarding Marinello's behavior during the time in question. For example, Peirano submits affidavits of her co-workers stating that Marinello made remarks and jokes about her medical condition, such as commenting that Peirano "needed a catheter because she was always in the bathroom." (Harrison Aff. ¶ 28; Casafont Aff. ¶ 29; Neidhart Aff. ¶ 26.) Peirano's co-workers aver they personally witnessed Marinello "single out" Peirano and treat her in an unprofessional matter. (Harrison Aff. ¶ 36; Casafront Aff. ¶ 36.) According to Harrison, Marinello would engage in such behavior on nearly a daily basis. (Harrison Aff. ¶ 28.)

7

### 2.    Complaints and Discipline History

Momentive provides that following Peirano's return to work in April 2010, Marinello verbally counseled her regarding attendance issues. (*See* Salazar Ex. 3.) Salazar maintains that during April and May 2010, she and Marinello discussed Peirano's attendance issues. (Salazar Dep. 13–16, ECF No. 22-4.) According to Salazar, she also discussed Momentive's corrective action plan with Marinello during this period. (*See id.* at 20–21.)

In June 2010, Peirano contacted Salazar to discuss the problems she was having with Marinello. (*See* Peirano Dep. 116–17.) Peirano and Salazar spoke on the phone on June 17, 2010 and met in person on June 22, 2010. (*See id.* at 119–20.) At this time, Peirano told Salazar that Marinello had been making comments about her illness. (*Id.* at 122–24.) According to Peirano, she again requested an accommodation for her start time and also requested that Salazar allow her to call in to someone other than Marinello. (*Id.* at 123.) Momentive submits that Salazar also discussed attendance issues with Peirano and informed her that she would be receiving a written warning regarding her attendance. (Salazar Decl. ¶ 5.) Momentive further maintains, through the Declaration of Salazar, that Salazar and Marinello made the decision to issue Peirano a written warning prior to June 16, 2010. (*Id.*) Peirano, however, indicates that she does not recall being told about any upcoming discipline during her meeting with Salazar. (Peirano Dep. 132–33.) Following the meeting, Salazar confirmed that Marinello had made the comments in question. (Salazar Dep. 21–22.) Salazar advised Marinello that she should not make such comments and also notified Marinello's supervisor. (*Id.* at 22.)

On June 28, 2010, Marinello and Salazar met with Peirano and issued her a "written reminder" under Momentive's corrective action procedure. (Peirano Dep. Ex. I.) The written

reminder stated that Peirano was not in compliance with Momentive's Attendance Policy and listed various countable attendance occurrences. (*Id.*) Peirano signed the form, referencing her medical condition within the comment section.[6] (*Id.* at 3.)

Momentive submits that following the written warning Peirano continued to have problems with attendance. (*See* Peirano Dep. Ex. N.) Salazar states that she and Marinello had multiple discussions regarding Peirano's ongoing attendance issues beginning on September 1, 2010. (Salazar Decl. ¶ 7.) On September 2, 2010, Peirano contacted Salazar to schedule a meeting to discuss Marinello. (*Id.* at ¶ 10.) On September 3, 2010, Sara Simmons ("Simmons"), the Director of Momentive's North American Customer Service, sent a meeting request to Marinello and Salazar indicating that she wished to discuss moving forward with a final warning to Peirano. (Simmons Decl. ¶¶ 1, 10; Simmons Ex. 1.) Later that same day, Peirano met with Salazar and Simmons.[7] (Salazar Decl. ¶ 12; Simmons Decl. ¶ 11.) Peirano maintains that during this meeting she informed Salazar that Marinello was treating her differently than others even though she was calling in as soon as possible. (Peirano Dep. 199.) Within her Declaration, however, Salazar asserts that Peirano admitted there were some occasions when she did not call in when she was late. (Salazar Decl. ¶ 12.)

On September 17, 2010, Marinello and Salazar met with Peirano and issued her a "final reminder" pursuant to Momentive's corrective action procedure. (Peirano Dep. Ex. N.) As with the earlier written reminder, the final reminder included a list of countable attendance

---

[6] The form explicitly provided, however, that a signature did "not imply agreement." (Peirano Dep. Ex. I at 3.)

[7] It appears that Simmons was present for only a portion of the meeting. (Peirano Dep. 199.)

9

occurrences. (*Id.*) Salazar contends that Peirano did not challenge the content of the final warning either during the September 17, 2010 meeting or at any other time. (Salazar Decl. ¶ 13.) Peirano contends, through her deposition testimony, that she told Salazar that Marinello's attendance records were incorrect during one of their meetings. (*See* Peirano Dep. 204–05.)

Momentive submits, once again through the records of Marinello, that Peirano continued to have problems with tardiness following her final warning. (*See* Salazar Ex. 3.) Momentive asserts that on January 6, 2010, Salazar and Simmons met with Joel Gabor, Momentive's Vice President of Commercial Services for North America, as well as in-house counsel, to discuss Peirano. (Salazar Decl. ¶ 16; Simmons Decl. ¶ 13.) According to both Salazar and Simmons, at the end of the meeting Mr. Gabor decided to terminate Peirano. (Salazar Decl. ¶ 16; Simmons Decl. ¶ 13.)

In January 2011, Peirano reached out to Julie Drew, Momentive's Human Resource Business Partner, to discuss her situation. (*See* Peirano Dep. 233–34.) The two exchanged voicemails. (*Id.* at 233–36.) On January 14, 2011, before speaking with Ms. Drew, Peirano met with Marinello and Salazar. (*Id.* at 247–48.) Marinello informed Peirano that Momentive was terminating her due to attendance problems. (*Id.* at 247.)

**D.    Procedural History**

Peirano filed this action on April 1, 2011, after receiving her Notice of Right to Sue from the Equal Employment Opportunity Commission on March 30, 2011. Peirano brings claims for disability discrimination, failure to accommodate, and retaliation under both the ADA and Ohio law. On April 4, 2011, following mediation, Momentive made an unconditional offer of reinstatement to Peirano. Peirano returned to work on April 24, 2012. On July 31, 2012,

Momentive brought its Motion for Summary Judgment. In August 2012, Peirano filed her Response in Opposition to Momentive's Motion for Summary Judgment.

On September 20, 2012, in conjunction with its Reply briefing, Momentive filed its Motion to Strike Portions of the Affidavits Peirano attached to her Response in Opposition. Momentive specifically maintains that various portions of the Affidavits of Peirano's co-workers are not based on personal knowledge or are otherwise inadmissible under the Federal Rules of Evidence. Peirano attached a Supplemental Declaration from Heather Neidhart. (ECF No. 33-1.) Momentive has also moved to strike the Declaration.

## II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59

11

(1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III. Analysis

Momentive moves for summary judgment as to all of Peirano's claims. Momentive contends that Peirano's disability discrimination and failure to accommodation claims must fail because Peirano is not a qualified individual. Momentive asserts, in the alternative, that Plaintiff cannot establish that Momentive failed to accommodate her disability. Additionally, Momentive maintains that (1) Peirano cannot establish that she was discharged because or her disability and (2) that it had a legitimate reason for discharging Peirano, her attendance. Momentive also asserts that Peirano's retaliation claims must fail because she cannot establish a causal connection between protected activity and an adverse employment action. Finally, Momentive maintains, with regard to the retaliation claims, that Peirano's attendance was a legitimate reason for her termination. Conversely, Peirano posits that factual disputes exist as to all of these issues. Ultimately, based on the record evidence, the Court agrees that genuine questions of fact exist as to Peirano's failure to accommodate, disability discrimination, and retaliation claims.

### A.    Plaintiff's Affidavits

As a preliminary matter, the Court must decide whether to strike various portions of the

evidence Peirano provides. As indicated above, in opposing summary judgment, Peirano submitted the affidavits of several of her co-workers, including three other CSRs who worked under Marinello. These co-workers offer statements on various subjects including aspects of the CSR position and Marinello's conduct towards Peirano. Momentive maintains, in part, that the statements within the affidavits stray outside the affiants' personal knowledge; contain impermissible opinion evidence; and are overly general and vague. Momentive also challenges the Supplemental Declaration of Neidhart as procedurally improper.[8]

Pursuant to Federal Rule of Civil Procedure 56 "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). With regard to the personal knowledge requirement, this Court has provided:

> [I]t must be evident from the affidavit that the facts contained therein are based on personal knowledge. *E.g., Allen v. International Tel. & Tel. Corp.*, 164 F.R.D. 489, 492 (D.Ariz.1995), *aff'd*, 111 F.3d 137, 1997 WL 168340 (9th Cir. 1997). Although the affidavit, ideally, will expressly state the basis for the facts, in some instances, personal knowledge may be inferred from the content of the statements. 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.14[1][c] (3d ed. 1999) ("For example, family members are presumed to have personal knowledge of a family member's possession of land. In the same manner, corporate officers are presumed to have personal knowledge of acts of their corporation."). "Personal knowledge may also flow logically from the context of the affidavit." *Id.* However, statements made "on information and belief" are insufficient to satisfy the personal knowledge requirement of [Rule 56(c)(4)]. *E.g., Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)) . . . .

---

[8] Momentive challenges the admissibility of the Supplemental Declaration's content as well.

13

*Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000).

Additionally, "[b]ecause the information contained in the affidavits must be admissible at trial, they must also comply with the Federal Rules of Evidence." *Cardiovascular & Thoracic Surgeons, Inc. v. St. Elizabeth Med. Ctr., Inc.*, No. 1:10–cv–846, 2012 WL 3962791, at *2 (S.D. Ohio Sept. 11, 2012). For lay opinions, the Federal Rules of Evidence require that such opinions be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or determining a fact in issue . . . ." Fed. R. Evid. 701.

As detailed above, Momentive challenges various portions of the relevant affidavits. Upon examination, the Court agrees with Momentive that some portions of the affidavits stray outside the personal knowledge of the affiants. For example, to the extent Peirano's co-workers attempt to testify to the knowledge and motivation of other individuals, including Marinello, the affiants have not provided sufficient information to establish personal knowledge.

At the same time, however, many of Momentive's challenges to the affidavits are unpersuasive. The Court can infer from the affidavits that the other CSRs would have knowledge of the basic practices and responsibilities of the CSR position. Additionally, much of the co-workers' testimony is based on personal observation of Marinello's conduct involving Peirano. Moreover, based on the information within the affidavits, it was not improper for the affiants to indicate, based on their own perceptions of Marinello's conduct, as to whether such conduct was unprofessional or offensive. Finally, to the extent Momentive challenges various statements on vagueness grounds, it appears to expect an unrealistic level of precision.[9] The

---

[9] For example, Momentive objects to various phrases within the affidavits, such as "numerous occasions" and "on a regular basis," on vagueness grounds.

14

Court recognizes that vague statements are generally insufficient to overcome a motion for summary judgment. Nevertheless, an objection to the admissibility of an affidavit is not the proper venue for attempting to pinpoint the precise meaning of the phrases and terms that the affiant uses.

Ultimately, the Court finds it unnecessary to conduct a line-by-line evaluation of the affidavits in question. Rather, for the purposes of the current Motion for Summary Judgment, the Court will only consider limited portions of the affidavits.[10] Specifically, the Court will consider the submissions of the other CSRs to the extent they describe the practices and procedures that applied to CSRs. Additionally, the Court will consider the personal observations of the affiants, including their observations of Marinello's conduct. In essence, the Court will limit itself to the submissions that it finds clearly within the affiants' personal knowledge, either because of personal observation or as a natural consequence of their work position.[11]

The Court will also consider a limited portion of the lay opinions Peirano's co-workers provide. In particular, the Court will allow the opinions of the other CSRs regarding whether a flexible start time would have been possible given the nature of the CSR position. Additionally, the Court will allow testimony indicating that Peirano's co-workers witnessed Marinello engage in unprofessional and offensive conduct directed at Peirano.[12] Based on the contents of the

---

[10] Within its analysis, the Court will explicitly reference the admissible portions of the affidavits that it has considered.

[11] Of course, the Court will also allow the affiants' testimony regarding their own personal conduct and experience.

[12] The Court will not consider, however, conclusions that Marinello's behavior and comments were discriminatory. *Cf. United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006) (explaining that conclusory testimony involving legal terminology, such as "that a company

15

affidavits, the Court can infer that such opinions are rationally based on the affiants' own perception. Moreover, as described further below, these opinions are helpful in demonstrating that there are material disputes of fact regarding relevant issues.

The parties also dispute how to approach specific portions of the evidence that Heather Neidhart ("Neidhart"), another co-worker of Peirano, has submitted. Of particular note, Neidhart provides—through her Affidavit and Supplemental Declaration—that she was able to obtain company access card records which identified the times Peirano swiped in during the mornings. (Neidhart Decl. ¶¶ 10–11.) Neidhart maintains that a comparison between the access card records, and Marinello's attendance records, demonstrate that Marinello was marking Peirano late on days she swiped in before her start time. (*Id.* at ¶ 11.) Momentive asserts that such evidence is inadmissible under Federal Rule of Evidence 1002 because Neidhart cannot testify to the contents of the access card records without providing the documentation.[13] *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."). For reasons detailed below, the Court finds that factual disputes exist even omitting the access card evidence. The Court will, therefore, not reach the issue at this time. Moreover, the Court also finds that it is unnecessary for it to consider Neidhart's Supplemental Declaration.

## B.    Failure to Accommodate and Disability Discrimination

Moving to the merits, Momentive seeks summary judgment on Peirano's failure to

---

engaged in discrimination, . . . nearly always invades the province of the jury.") (internal quotations omitted).

[13] Peirano, in turn, suggests that an exceptions apply. *See* Fed. R. Evid. 1004 (outlining when other evidence of content is admissible).

accommodate and disability discrimination claims. Although Peirano brings her claims under

both the ADA and state law, the parties agree that because Ohio law imposes the same

requirements, the Court may consider Peirano's state claims in conjunction with her federal

claims. *See Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) ("Both

federal and Ohio disability discrimination actions require the same analysis.") (internal

quotations omitted).

The United States Court of Appeals for the Sixth Circuit has outlined the following

elements for a failure to accommodate claim under the ADA:

> A plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she
> is otherwise qualified for the position, with or without reasonable accommodation;
> (3) her employer knew or had reason to know about her disability; (4) she requested
> an accommodation; and (5) the employer failed to provide the necessary
> accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). Once a plaintiff

establishes these elements, "the burden shifts to the employer to demonstrate that any particular

accommodation would impose an undue hardship on the employer." *Id.* at 983.

To succeed on a claim for disability discrimination under the ADA, "the plaintiff must

establish that (1) he is disabled, (2) he is qualified to perform the job requirements with or

without reasonable accommodation, and (3) he would not have been discharged but for his

disability." *Frengler v. Gen. Motors*, No. 11–3378, 2012 WL 2044419, at *2 (6th Cir. June 7,

2012). With regard to the causation element, the Sixth Circuit has recently held that "the ADA

bar[s] discrimination 'because of' an employee's . . . disability . . . ." *Lewis v. Humboldt

Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012).

### 1.    Qualified Individual

In light of the above elements, the parties first dispute whether Peirano is a qualified individual, with or without reasonable accommodation.  Both failure to accommodate and disability discrimination claims require that Peirano be a qualified individual.  Momentive maintains that, at the time of the employment decision in question, Peirano was not a qualified individual because she was not capable of meeting the attendance and punctuality requirements of the CSR position.

The ADA defines "qualified individual" as follows:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).  Regulations further provide, "[t]he term essential means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n).  In addition to an employer's judgment, the Court may also consider the work experience of past and current incumbents in determining a positions essential functions.  *Id.*; *see also Brown v. Chase Brass & Copper Co., Inc.*, 14 F. App'x 482, 489 (6th Cir. 2001) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.") (internal quotations omitted).  Ultimately, "the inquiry into whether a function is essential is highly fact specific." *Id.* (internal quotations omitted).  Finally, the Court makes the determination of

18

whether an individual is qualified at the time of the employment decision in question. *See Neview v. D.O.C. Optics Corp.*, 382 F. App'x 451, 459 (6th Cir. 2010) (considering whether the plaintiff was a qualified individual at the time of her termination).

Here, Momentive contends that attendance and punctuality were essential functions of the CSR position. Momentive stresses that its Attendance and Reliability Policy required regular attendance and emphasized the indirect costs, including overtime payment to other workers, associated with absenteeism. (*See* Salazar Ex. 2.) Additionally, Momentive emphasize the importance of attendance to the CSR position. Momentive contends that because the Epoxy CSR team consisted of only six people, the absence of one individual, even for a short period of time, impacted the productivity of the entire team. Finally, Momentive asserts that Peirano's entire attendance record demonstrates that she was unable to make it to work in a predictable fashion.

Peirano, however, maintains that punctuality was not an essential function of the CSR position. Peirano specifically submits evidence suggesting that when a particular CSR is unavailable to assist a customer, the customer has the option of leaving a voicemail or being forwarded to an available representative. (*See, e.g.*, Casafront Aff. ¶ 14.) Additionally, Pierano's CSR co-workers provide that it was not uncommon for a CSR to be unable to immediately speak to a customer, and, therefore, have to return a call at a later time in the day. (*See, e.g.*, Longacre-Dunn Aff. ¶ 13.) Moreover, Periano's CSR co-workers all indicate that they have never had a situation where another CSR was unable to handle a customer's problem. (Casafront Aff. ¶ 15; Harrison Aff. ¶ 14; , Longacre-Dunn Aff. ¶ 14.) Accordingly, three of the CSRs who worked with Peirano testify that a flexible start time would not have prevented a CSR from successfully performing his or her job. (Casafront Aff. ¶ 12; Harrison Aff. ¶ 11; , Longacre-Dunn Aff. ¶ 11.)

19

Here, the Court finds that there are disputed issues of material fact regarding whether Peirano is a qualified individual. First, the Court recognizes, as Momentive stresses, that numerous courts have found attendance to be an essential function of various positions. *See, e.g.*, *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012) ("In fact, absenteeism may prevent a plaintiff from proving that she was 'qualified' for protection under the ADA."). Even assuming that attendance was an essential function of the CSR position, however, there is at least a question of fact as to whether Peirano was unable to attend work during the relevant period in question.

Momentive maintains that Peirano's entire attendance record demonstrates that she was unable to attend work in a predictable fashion. Viewing Peirano's records without context, however, is misleading. Peirano missed a considerable portion of work from April 2010 to early June 2010, when her condition was initially diagnosed and treated. She received short-term disability over this time frame. Nevertheless, beginning in June 2010, Peirano was cleared to return to work. *See Melange v. City of Ctr. Line*, No. 11–1053, 2012 WL 1959319, at *3 (6th Cir. May 31, 2012) (noting that because a manual labor position required attendance, the plaintiff needed to show that he was authorized to return to work prior to his termination to be a qualified individual). Momentive's termination of Peirano did not occur until January 2011.[14] Following June 2010, even crediting Marinello's attendance records, which Peirano contests, there were relatively few dates when Peirano was completely unable to work due to sickness. (*See* Salazar Ex. 3.) Under these circumstances, the record does not necessarily reflect that Peirano was

---

[14] Moreover, following June 2010 the record reflects that the parties continued to engage in discussions, and adjustments, regarding work accommodations.

incapable of attending work during the time of the relevant employment decisions.

Rather, in this case, the more precise question is whether punctuality was an essential function of the CSR position.[15] After all, Marinello's attendance records reflect, and Peirano admits, that Peirano's condition often kept her from arriving to work on time. The Court finds that, given the evidence before it, there is a legitimate factual dispute regarding whether punctuality was a fundamental duty of the CSR position. The attendance policy and the testimony of Salazar and Simmons suggest that punctuality was a requirement of the position and that a lack of punctuality created various costs for Momentive. The Court acknowledges that employer's descriptions of job duties are generally due considerable weight in analyzing essential functions.

Nevertheless, the Sixth Circuit has also provided that determining essential functions is a fact-specific endeavor that should reflect the actual circumstances of the position. *Brown*, 14 F. App'x at 489. Here, three of Peirano's CSR co-workers have testified that a flexible start time would not have impeded a CSR's ability to complete their duties. More specifically, Peirano and these co-workers state that, in practice, even CSRs who were present often missed, and had to later return, customer phone calls. Moreover, Peirano's CSR co-workers assert that the call system allowed a customer, in case of an emergency, to be transferred to an available CSR who could handle the problem.[16] Under these circumstances, the Court finds that a reasonable jury

---

[15] Importantly, the record reflects that, even with a flexible start time, Peirano was willing to perform a full-time work schedule. Peirano reports that she offered to make up missed time when she was unable to arrive at 9:00 a.m. (*See* Peirano Dep. 76.)

[16] Notably, Peirano's co-workers also provide that they routinely witnessed another CSR, Michael Leskovac, arriving late. (*See, e.g.*, Harrison Aff. ¶ 21.)

21

could conclude that punctuality was not an essential function of the CSR position. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257–61 (11th Cir. 2007) (holding that despite the employer's description of the position in question that a fact issue existed as to whether strict punctuality was an essential function of the plaintiff's position). Consequently, there is also a question of fact as to whether Peirano was a qualified individual within the meaning of the ADA.

## 2. Failure to Accommodate

Momentive further maintains that even if Peirano is a qualified individual, she cannot establish that Momentive failed to accommodate her. Peirano, on the other hand, contends that she proposed the reasonable accommodation of a flexible start time, that Momentive routinely changed the accommodations it did provide, and that Marinello unfairly implemented the various accommodations.

In analyzing a failure to accommodate claim, "[a]n employee has the burden of proposing an initial [reasonable] accommodation." *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2012) (internal quotations omitted, alterations in original). "[T]he inquiry into reasonableness requires [ ] a factual determination untethered to the defendant employer's particularized situation."[17] *Id.* (internal quotations omitted, alterations in original). The ADA explicitly provides that reasonable accommodations may include "job restructuring [as well as] part-time or modified work schedules . . . ." 42 U.S.C. § 12111(9)(B). Nevertheless, "while job restructuring is a reasonable accommodation, this term only pertains to the restructuring of non-essential duties or marginal functions of a job." *Steward v. New Chrysler*, 415 F. App'x

---

[17] On the other hand, "the question of whether a reasonable accommodation imposes an undue burden is evaluated with regard to the employer's specific situation." *Walsh v. United Parcel Serv.*, 201 F.3d 718, 726 n.3 (6th Cir. 2000).

632, 642 (6th Cir. 2011).

Moreover, the Sixth Circuit has noted that "[t]he ADA's regulations indicate that, '[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee].'" *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(o)(3)). This process requires good-faith communication between the parties to explore possible accommodations. *Kleiber*, 485 F.3d at 871. Although an employer is not require to propose a counter-accommodation to an employee's initial offer, a counter proposal is evidence of good-faith. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010). Importantly "[i]f an employer takes that step and offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Id.*; *see also Trepka v. Bd. of Ed.*, 28 F. App'x 455, 459 ("The employer need not provide the accommodation that the employee requests or prefers. Instead, the employer retains the 'ultimate discretion' to choose another effective accommodation, even if less expensive or easier to provide.").

Here, the Court finds that there are disputed issues of fact that preclude summary judgment. First, there is a disputed question of fact as to whether Peirano met her burden of proposing an initial reasonable accommodation.[18] Peirano submits that on multiple occasions she requested that Momentive provide her with a flexible start time due to her condition. (*See* Peirano Dep. 75, 123.) The parties do not dispute that Momentive denied such requests. As with the consideration of whether Peirano is a qualified individual, there are disputes of fact

---

[18] Similarly, for the reasons described below, there are questions of fact surrounding whether Peirano's requested accommodation would impose an undue burden on Momentive.

23

regarding whether Peirano's request for a flexible start time would have been reasonable. Relying on the attendance policy as well as the submissions of Simmons and Salazar, Momentive suggests that punctuality was an essential function of the CSR position. At the same time, however, Peirano submits evidence—including affidavits from fellow CSRs—suggesting that given the actual practices of the CSR position a flexible start time would not have prevented her from performing her basic duties. Under these circumstances, the Court finds that a jury could find Peirano's initial request reasonable.

There are also questions of fact surrounding whether Momentive provided a reasonable alternative accommodation. As detailed above, even assuming Peirano's requested accommodation was reasonable, an employer is entitled to offer an alternative reasonable accommodation. Momentive maintains that it did reasonably accommodate Peirano's condition by setting up a call-in procedure. Nevertheless, based on the current evidence, there is a genuine issue of material fact as to whether Momentive truly provided a reasonable accommodation tailored to Peirano's condition. Peirano stresses that the terms of the purported accommodation frequently changed.[19] In particular, Peirano submits that Marinello originally required her to call in as soon as possible if she was going to be late. (Peirano Dep. 76.) Peirano's testimony suggests that upon her return to work in June 2012 Marinello altered the accommodation, albeit at least somewhat informally, to require that Peirano call in as soon as possible, but also before her 9:00 a.m. start time. (*See id.* at 105.) Finally, Peirano testifies that eventually Marinello required her to call in ten to fifteen minutes before her start time in order to avoid an attendance

---

[19] Momentive appears to concede that it altered the terms of the accommodation. (*See* Defs.' Reply 18, ECF No. 31.)

occurrence. (*Id.* at 196.)

Momentive maintains that there is nothing improper with an employer adjusting accommodations to fit the situation. The Court agrees that the ADA gives the employer the ultimate discretion to choose an effective accommodation. Nevertheless, for an accommodation to be reasonable, it is natural to presume that the employer must provide the standards of its alternative accommodation in a clear manner, which allow an employee to comply. Moreover, alternative accommodations must still be reasonable and fit the limitations of the employee's condition.

Here, even assuming that Momentive altered its accommodation in a manner that clearly set forth the new requirements to Peirano,[20] there are questions whether Momentive's alternative accommodations actually satisfied Peirano's condition. Peirano maintains that her condition left her unable to control her bowels, and would result in the instantaneous and unpredictable onset of symptoms leaving her temporarily debilitated. Given the unpredictable nature of her condition, Peirano maintains that she was not always able to call in advance of her start time. Momentive, on the other hand, asserts that Peirano could have kept both a clock and a phone in her bathroom and still called into work before her start time. Although such an approach was likely possible, the reasonableness of requiring someone with Peirano's condition to call into work from the bathroom while experiencing her purported symptoms presents a genuine issue of material fact. Once again, Peirano submits that onset of symptoms was unpredictable, leaving her unable to plan when she was going to be late. Accordingly, applying a ten to fifteen minute

---

[20] This proposition is not certain because, at least by Peirano's account, it appears that Marinello unilaterally altered the call-in procedures without detailed discussion.

advance call time leaves open the substantial possibility that Peirano would receive occurrences simply because of the timing of her uncontrolled symptoms.

Moreover, even assuming that Momentive identified and articulated a reasonable accommodation, it still must actually provide the accommodation. *See Johnson*, 443 F. App'x at 983 (explaining that the last element of a failure to accommodate claim requires a plaintiff to show that the employer actually failed to provide a necessary accommodation). In this case, Peirano contends that Marinello, the individual in charge of monitoring the call-in procedure, failed to even-handledly implement the accommodation. Most specifically, Peirano testifies that Marinello would mark her as late on days when she was calling in. (*See, e.g.*, Peirano Dep. 130, 139–40.) Momentive's evidence regarding Peirano's attendance and punctuality appear to come primarily, if not exclusively, from Marinello's notes. Accordingly, whether Marinello, and thus Momentive, fairly applied its call-in procedures appears to center around a credibility dispute between Marinello and Peirano. Moreover, Peirano provides, and her co-workers confirm, that she began calling her co-workers, in addition to Marinello, to inform them that she would be late. (*See, e.g., id.* at 130; Harrison Aff. ¶ 15.) Under these circumstances, there is a genuine factual dispute concerning whether Momentive actually provided a reasonable accommodation.

### 3. Adverse Action Because of Disability

With regard to Peirano's disability discrimination claim, Momentive maintains that Peirano cannot establish that she was terminated because of her disability. Moreover, Momentive maintains that Peirano's attendance, as well as other behavioral concerns, gave Momentive a legitimate non-discriminatory reason for discharging Peirano. Peirano counters that, pursuant to a cat's paw theory, Momentive did fire her because of her disability due to the

discriminatory actions of Marinello. Additionally, Peirano maintains that Momentive's purported reasons for firing her are a pretext because her attendance information was inaccurate and any behavioral issues she had were so minor as to play no role in the discharge.

### a. Cat's Paw Theory of Liability

As detailed above, an ADA discrimination claim requires a plaintiff to demonstrate that he or she suffered adverse action because of his or her disability. Relatedly, both the Supreme Court and the Sixth Circuit have recently embraced the "cat's paw theory" of liability—for the purposes of determining discriminatory animus—within the employment discrimination context. *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011) (holding that a cat's paw theory of liability to a claim under the Uniformed Services Employment and Reemployments Rights Act); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351–53 (6th Cir. 2012) (applying the cat's paws theory of liability to a plaintiff's Title VII claims); *see also Hubbell v. Better Bus. Bureau of Minnesota*, No. 09-1173, 2010 WL 5421328, at *3 (D. Minn. Dec. 27, 2010) (holding that the cat's paw theory applied within the context of the ADA). Under the cat's paw theory, "if a supervisory performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub*, 131 S.Ct. at 1194 (emphasis in original). In other terms, a "[p]laintiff must show that '[b]y relying on [] discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *Chattman*, 686 F.3d at 350.

Here, Peirano has submitted sufficient evidence to create material disputes of fact as to whether a cat's paw theory of liability applies. To begin with, based on the evidence before the

Court, a reasonable jury could find that Marinello engaged in discriminatory conduct against Peirano. As detailed above, Peirano challenges the accuracy of Marinello's attendance records. Because Marinello's attendance records are heavily, if not completely, reliant on Marinello's word, the trier of fact must ultimately evaluate the credibility of Marinello and Peirano. Additionally, Peirano's co-workers provide at least some support to Periano's testimony that she began calling in to her co-workers when she was going to be late in order to protect herself. (*See, e.g.*, Harrison Aff. ¶ 15.)

Moreover, the evidence, at least when viewed in the light most favorable to Peirano, suggests that Marinello engaged in inappropriate conduct relating to Peirano's condition. Peirano's co-workers report that Marinello made offensive remarks about Peirano's condition and frequent trips to the bathroom, including that she needed a catheter or port-o-potty. (*See, e.g.*, Neidhart Aff. ¶ 26.) Although Momentive describes such behavior as isolated, at least one of Peirano's co-workers indicates that such conduct "would happen pretty much on a daily basis." (Harrison Aff. ¶ 28.) Notably, such reported remarks not only suggest that Marinello acted in a hostile manner towards Peirano, but also that Marinello was singling out Peirano's condition.[21]

Finally, Peirano has produced evidence providing at least some suggestion that Marinello treated non-disabled CSR's differently with regard to their schedules.[22] As described above,

---

[21] Momentive suggests that the tension between Marinello and Peirano was simply due to a "personality conflict." (*See* Peirano Dep. Ex. Q, ECF No. 22-2.) As described above, however, in light of the evidence, including Marinello's alleged comments regarding Peirano's condition, a reasonable jury could conclude that Marinello's conduct went beyond a mere personality conflict.

[22] As detailed above, Momentive has produced evidence that Marinello disciplined other CSRs for attendance issues. For the reasons described above, however, the Court finds that

Casafront, a non-disabled CSR, states that although she arrived late and took long lunch breaks on several occasions, Marinello did not discipline her for her attendance. (Casafront Aff. ¶ 20.) Additionally, Casafront provides that she witnessed Michael Leskovac, another CSR under Marinello, arrive late on a regular basis.[23] (*Id.* at ¶ 24.)

Ultimately, viewing the totality evidence, a reasonable jury could infer that Marinello was acting with a discriminatory intent. Specifically, combining (1) Peirano's testimony challenging the accuracy of Marinello's attendance records, (2) Marinello's purported comments and behavior regarding Peirano's condition, and (3) evidence indicating that Marinello applied the attendance policy more leniently to other CSRs, there is a question of fact concerning whether Marinello acted adversely toward Peirano because of her disability.

There is also a genuine dispute of fact regarding whether, through any discriminatory conduct, Marinello intended Peirano to suffer an adverse employment action. Crediting Peirano's testimony, Marinello was consistently creating inaccurate attendance records and reporting them to her superiors. If Marinello was truly engaging in such conduct, it would be reasonable to infer that Marinello wanted Momentive to discipline Peirano and ultimately fire her. Momentive suggests, through the testimony of Marinello, that Marinello fought to keep Peirano. (*See* Marinello Dep. 75.) As discussed above, however, Peirano has submitted

Peirano has provided sufficient evidence to create a dispute regarding whether Marinello even-handedly applied the attendance policy.

[23] As Momentive stresses, it is not clear that Peirano's co-workers knew whether Mr. Leskovac had called in advance or if he was ever disciplined for this conduct. At the same time, however, Momentive has not provided any evidence that Marinello disciplined Mr. Leskovac for his punctuality or that he had permission to regularly arrive late. Drawing reasonable inferences in favor of Peirano, her co-workers observation of Mr. Leskovac raise an inference that Marinello was selectively enforcing the attendance policy.

evidence that Marinello routinely treated Peirano in an offensive manner. Under these circumstances, Marinello's intent is a question properly left to the jury.

The final requirement for cat's paws liability is that the supervisor's conduct actually cause the adverse employment action. At least for the purposes of summary judgment, Peirano has submitted sufficient evidence to satisfy this element. Momentive maintains that it was ultimately Joel Gabor, Momentive's Vice President, that made the decision to terminate Peirano. Nevertheless, the evidence suggests that Mr. Gabor made this decision because of Peirano's poor attendance records.[24] For example, Momentive's "Termination Talking Points With Severance" script indicates that Peirano was let go because of failure to comply with attendance procedures. (*See* Pl.'s Resp. Opp'n Ex. H, ECF No. 26-8.) The disciplinary action forms Momentive has provided also indicate that attendance was Momentive's primary concern. (*See* Peirano Dep. Ex. I, N, O.) Marinello was responsible for monitoring Peirano's attendance and providing attendance records. Tellingly, the attendance records and corrective action forms Momentive provides, all appear to be based on Marinello's account of Peirano's attendance.[25] (*See* Peirano Dep. Exs. I, N, O; Salazar Ex. 3.) Accordingly, it is reasonable to conclude that Marinello's actions with regards to Peirano's attendance records caused her termination.

---

[24] For reasons described further below, there is a genuine issue of material fact as to whether Peirano's other behavioral issues were actually a significant factor in her termination.

[25] Momentive has not provided any indication that there was any investigation, outside of Marinello's records, into Peirano's attendance. Salazar maintains that, in their discussions, Peirano never questioned the accuracy of Marinello's records. (Salazar Dep. 26.) Peirano's testimony, however, suggests that she did tell Salazar that Marinello's records were at least partially incorrect. (*See, e.g.*, Peirano Dep. 204.) Accordingly, there appears to be a genuine dispute regarding this issue.

### b.  Burden-Shifting Analysis

Once a plaintiff establishes a *prima facie* case of disability discrimination, "the burden

shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse

action]." *Brown v. Chase Brass & Copper Co., Inc.*, 14 F. App'x 482, 486 (6th Cir. 2001)

(internal quotations omitted). "When the defendant articulates a legitimate non-discriminatory

reason for undertaking an adverse employment action, the plaintiff must introduce evidence that

the proffered reason is a pretext for discrimination." *Id.* (internal quotation omitted).

Specifically, the defendant must establish "(1) that the proffered reasons had no basis in fact; (2)

that the proffered reasons did not actually motivate the employment decision, which requires

additional evidence of discrimination; or (3) that the proffered reasons were never used in the

past to discharge an employee." *Layman v. Alloway Stamping & Mach. Co., Inc.*, 98 F. App'x

369, 376 (6th Cir. 2004).  Ultimately, to avoid summary judgment, a plaintiff must establish a

question of fact as to whether the employer's "explanation for its termination decision is

pretextual." *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).

In this case, there are questions of fact regarding whether Momentive's purported reasons

for terminating Peirano are pretextual.  Momentive first maintains that it fired Peirano because of

her attendance record.[26]  Nevertheless, under Momentive's attendance policy, it was Marinello's

duty to monitor Peirano's attendance.  Although Marinello did not ultimately make the

termination decision, it appears that her supervisors did so based on the attendance records

---

[26] In concluding that issues of fact remain, the Court acknowledges, as detailed above, that Peirano admitted to being late for non-medical reasons on a few isolated occasions.  Peirano testifies that she called or spoke to Marinello in advance on all of these occasions.  Construing the evidence in Peirano's favor, the trier of fact could reasonably infer that these incidents, in and of themselves, were not the actual motivation for Peirano's termination.

31

Marinello created. For the reasons described above, a reasonable jury could impute discriminatory animus—on the part of Marinello—to Momentive under a cat's paw theory. Accordingly, given the disputes of fact surrounding Marinello's attendance records, there is also a genuine dispute of fact concerning whether Momentive's attendance concerns are a pretext to mask the discriminatory conduct of Marinello. *See, e.g.*, *Branscomb v. Group USA, Inc.*, 475 F. App'x 134, 136 (9th Cir. 2012) (holding that because a cat's paw theory of liability potentially applied, there was a triable issue as to whether the employer's decision to fire the plaintiff "was mere pretext for race discrimination"); *Cornell v. North Wasco Cnty. Sch. Dist. No. 21*, No. 03:10–cv–00964, 2012 WL 4595341, at *5 (D. Or. Oct. 2, 2012) (holding "[i]t was sufficient at the pretext stage that there was evidence suggesting that the board may have been influenced by biased administrators which in turn undermined the district's argument that the policy was adopted for legitimate reasons"); *Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1093 n.45 (S.D. Ala. 2009) (suggesting that a decisionmaker's honest belief in information would not exonerate defendants if supervisor's improper motivations could be imputed under a cat's paw theory).

Momentive also maintains that it terminated Peirano in part due to behavioral issues. Momentive stresses that on multiple occasions Peirano openly criticized her co-workers in a rude manner. Specifically, Momentive reports occasions in which Peirano demonstratively complained about co-workers Harrison and Mr. Leskovac. (*See* Salazar Decl. ¶¶ 7–8.) Based on a review of the record, the Court finds it questionable whether such incidents significantly contributed to Momentive's termination decision. The Corrective Action Forms Momentive provides suggest that attendance was the primary, if not only, issue with Peirano's performance. (*See* Peirano Dep. Exs. I, N, O.) Moreover, construing the evidence in Peirano's favor, the

behavioral issues Momentive highlights appear to be relatively minor and isolated incidents. Comparatively, although Salazar confirmed that Marinello had made jokes regarding Peirano's condition, it appears that Marinello received only verbal coaching. (*See* Salazar Dep. 22.) Under these circumstances, a reasonable jury could find that Momentive's behavioral concerns were not the real reason for termination.

## C. Retaliation

Finally, in addition to the failure to accommodate and disability discrimination claims, Momentive also seeks summary judgment on Peirano's retaliation claims.[27] Momentive contends that Peirano's retaliation claims must fail because she cannot establish a causal connection between her protected activity and an adverse employment action. Additionally, Momentive again asserts that it had legitimate non-discriminatory reasons for Peirano's determination.

To establish a retaliation claim under the ADA, a "plaintiff to show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action." *Bryson.*, 498 F.3d at 577. In this case, only the last element is in dispute.[28] "To establish causation, [a plaintiff] must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity." *Simpson v. Vanderbilt Univ.*, 359 F. App'x

---

[27] Although Peirano brings retaliation claims under both the ADA and Ohio law, the Court can consider both claims under the ADA's framework. *See Steele v. Oasis Turf & Tree, Inc.*, No. 1:10–cv–769, 2012 WL 3028514, at *4 (S.D. Ohio July 25, 2012) (indicating that the ADA and Ohio law generally apply the same basic analytically standards for retaliation).

[28] For the purposes of summary judgment, Momentive appears to concede that Peirano's requests for accommodation and complaints regarding Marinello were protected activity.

562, 571 (6th Cir. 2009). Moreover, "[c]ausation can be inferred from indirect or circumstantial evidence, including 'evidence that [the] defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "The burden of establishing causation is not onerous, but it does rest on the plaintiff." *Johnson v. Cleveland City School Dist.*, 344 F. App'x 104, 113 (6th Cir. 2009). Furthermore, following *Staub*, at least one Court of Appeals has held that the cat's paw theory may also be used to impute "retaliatory animus to a decisionmaker when the party nominally responsible for a decision is, by virtue of her role in the company, totally dependent on another employee to supply the information on which to base that decision." *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 790 (7th Cir. 2012).

The Sixth Circuit has recognized that, under certain circumstances, temporal proximity between protected activity and adverse employment action may be "significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The Sixth Circuit has also acknowledged, however, "that often evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). Accordingly, in considering temporal proximity cases, the Court must "look[] at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Id.*

Here, the timing of events provides at least some reason to infer retaliatory animus on the part of Marinello. Peirano suffered adverse consequences relatively close to her requests for an

34

accommodation and her complaints about Marinello's behavior. Peirano requested an accommodation in April 2010 and further discussed this accommodation with Marinello in June 2010 upon returning to work following hospitalization. (*See* Peirano Dep. 75, 105.) According to Peirano and her co-workers, after Peirano's return to work, Marinello began making comments relating to Peirano's accommodation, specifically her need to take frequent bathroom breaks. Accordingly, on June 22, 2010, Peirano complained of Marinello's behavior to Salazar and again requested help with her start time. (*Id.* at 122–24.) Peirano received her first corrective action form, a written reminder, on June 28, 2010. (Peirano Dep. Ex. I.) In early September 2010, Peirano met with both Salazar and Simmons, telling them that Marinello was treating her differently from other CSRs. (*See* Peirano Dep. 199.) On September 17, 2010, Peirano received her second correction action form, a final reminder. (Peirano Dep. Ex. N.) Finally, in January 2011, Peirano attempted to contact another Human Resources executive, Julie Drew, regarding the situation. (*See* Peirano Dep. 232–35.) Momentive terminated Peirano on January 14, 2011. (*Id.* at 247–48.)

Momentive has provided evidence undercutting, to a certain degree, Peirano's temporal proximity contentions. Momentive maintains that Salazar and Marinello had decided to issue a written warning before Peirano contacted Salazar. (Salazar Decl. ¶ 5.) According to Salazar, he informed Peirano at the June 2010 meeting that she would be receiving a written warning. (*Id.*) Peirano, however, states that Salazar did not tell her in this meeting that she was going to be disciplined. (Peirano Dep. 132–33.) Additionally, Momentive provides that Simmons scheduled a meeting in order to move forward with a final warning on September 3, 2010, before meeting

with Peirano.[29] (Simmons Decl. Ex. 1, ECF No. 22-8.) Finally, Momentive submits that prior to Peirano's attempts to contact Ms. Drew, Salazar had already scheduled a meeting with Mr. Gabor for January 6, 2011. (*See* Salazar Decl. ¶¶ 15–16.) According to Momentive, Mr. Gabor made the ultimate decision to terminate Peirano on January 6, 2011. (*Id.* at ¶ 16.)

Even assuming under these circumstances, however, that temporal proximity is insufficient—in and of itself—to establish a causal connection, other evidence also would allow an inference of retaliatory motive on the part of Marinello. Once again, Peirano disputes the accuracy of Marinello's overall attendance records. Moreover, although these records contain occurrences prior to Peirano's request for accommodation, the number and frequency of occurrences is far greater after Peirano requested an accommodation. (*See* Salazar Ex. 3.) As detailed above, there is also evidence that Marinello made offensive comments directly relating to Peirano's accommodations. Furthermore, as previously discussed, Peirano has produced evidence providing at least some suggestion that Marinello was not enforcing the attendance policy in the same manner against other CSRs. Viewing these factors as a whole, and construing the evidence in Peirano's favor, a reasonable jury could find that—in monitoring Peirano's attendance—Marinello was acting with a retaliatory animus. Moreover, following the line of reasoning highlighted above, any such animus could be imputed to Momentive pursuant to a cat's paw theory. Consequently, a reasonable jury could find a causal connection between Peirano's requests for accommodation, as well as complaints regarding Marinello, and Momentive's disciplinary actions and ultimate decision to terminate Peirano.

---

[29] It appears, however, that Peirano contacted Salazar on September 2, 2010 to schedule a meeting to discuss Marinello. (Salazar Decl. ¶ 10.)

Finally, the Court once again finds that there is a genuine issue of fact regarding whether Momentive's purported reasons for termination are pretextual. Retaliation claims apply the same general burden-shifting schemes as disability discrimination claims. *See Baker v. Windsor Republic Doors*, 414 F. App'x 764, 778 (6th Cir. 2011) (applying the burden-shifting scheme to a retaliation claim under the ADA). With regard to Peirano's retaliation claims, Momentive again maintains that it terminated Peirano due to her attendance and other behavioral issues. As with Peirano's disability discrimination claim, the current evidence allows for the inference that Marinello was acting in a retaliatory fashion when tracking Peirano's attendance. Under a cat's paw analysis, Marinello's intentions may be imputed to Momentive. Under such circumstances, Momentive's attendance concerns would be a pretext for Peirano's termination, masking Marinello's retaliatory conduct. Moreover, for the reasons described above, there is a question of fact as to whether other behavioral issues were really the reason for Peirano's termination.

### IV. Conclusion

For the foregoing reasons, Momentive's Motion for Summary Judgment is **GRANTED** with regard to Peirano's wage and hour claims, but **DENIED** with regard to Peirano's claims for disability discrimination, failure to accommodate, and retaliation. (ECF Nos. 22.) Momentive's Motions to Strike are **DENIED** subject to the qualifications outlined in this Opinion and Order. (ECF Nos. 30, 35.)

**IT IS SO ORDERED.**

10- 17-2012
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**